# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

FILED: AUGUST 7, 2015

No. 13-5202

MATT SISSEL,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01263)

———

On Petition for Rehearing En Banc

———

Before: GARLAND, *Chief Judge*; HENDERSON\*, ROGERS,
TATEL, BROWN\*, GRIFFITH\*, KAVANAUGH\*, SRINIVASAN,
MILLETT, PILLARD and WILKINS, *Circuit Judges*

## **O R D E R**

Appellant's petition for rehearing en banc, the response
thereto, and the briefs of amici curiae in support of appellant
were circulated to the full court, and a vote was requested.
Thereafter a majority of the judges of the court in regular, active

service did not vote in favor of the petition. Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/

Ken Meadows
Deputy Clerk

\* Circuit Judges Henderson, Brown, Griffith, and Kavanaugh would grant the petition.

A statement by Circuit Judges Rogers, Pillard, and Wilkins, concurring in the denial of rehearing en banc, is attached.

A statement by Circuit Judge Kavanaugh, with whom Circuit Judges Henderson, Brown, and Griffith join, dissenting from the denial of rehearing en banc, is attached.

ROGERS, PILLARD, AND WILKINS, *Circuit Judges*, concurring in the denial of rehearing *en banc*: A majority of the court has voted to deny the petition for *en banc* rehearing of this case. A dissenting statement, however, charges the original panel opinion with undermining individual liberty by upsetting the balance of power between the two Houses of Congress. *See* Dissent 32. Our opinion does no such thing.

Our examination of the Origination Clause's text and history, as well as congressional practice and Supreme Court precedent related to the Clause, persuaded us that the clearest and narrowest ground on which to resolve Sissel's challenge to the payment required under section 5000A of the Affordable Care Act, 26 U.S.C. § 5000A, was to rely on the Supreme Court's established purposive approach. The Court recognized in *National Federation of Independent Business (NFIB) v. Sebelius*, 132 S. Ct. 2566, 2596 (2012), that, "[a]lthough the [section 5000A] payment will raise considerable revenue [if people do not 'sign up'], it is plainly designed to expand health insurance coverage," acknowledging that the purpose of the Affordable Care Act ("ACA") and its tax penalty was to spur conduct, not to raise revenue for the general operations of government.

Doctrinal and prudential reasons counseled against relying on the alternative ground that the dissent proposes the *en banc* court adopt. Among other things, the panel's narrow course avoided more categorical and less historically rooted holdings that the dissent's approach would require: (1) that all bills containing tax provisions that do not designate the funds raised for use by a specified government program implicate the Origination Clause, and (2) that the Senate may amend House-originated revenue bills without limit. The former is contrary to the best reading of governing law, which does not support application of the Origination Clause to legislation like the ACA. The latter may be contrary to congressional practice or, relatedly, be perceived as judicial endorsement of

treating the Origination Clause as empty formalism. The panel found no reason to tread on such infirm ground. The dissent disagrees, and in doing so occasions this response.

The dissent misreads the Supreme Court's Origination Clause precedent. The novel approach proposed by the dissent—exempting bills that levy taxes from the Origination Clause where they designate the funds for exclusive use by a particular government program—is also flawed for a number of other reasons. Textually, the dissent asserts that the Origination Clause "unmistakably embraces all bills that are intended to raise revenue." Dissent 13. The dissent provides no satisfying explanation why bills that raise revenue designated for expenditure only on specified programs—and only such bills—are outside the Clause, nor how the Clause's text forecloses the panel's interpretation. *See* Dissent 13, 17-20. The dissent's analysis of congressional practice suffers from the same defect. The House of Representatives has at times interpreted the Clause more broadly than does the Supreme Court, the panel, or the dissent, and it retains the prerogative to do so. The dissent's discussion of the history of the Constitution's ratification as relevant to the Origination Clause analysis omits essential context that undercuts the dissent's conclusions. *See* Dissent 13-16, 25-28. We take up the dissent's principal concerns below.

**I.**

The panel opinion rests, as it must, on binding Supreme Court precedent. The Supreme Court has never found an Origination Clause violation. And, in three separate cases spanning more than a century, it held that the variable controlling whether a statutory provision falls within the ambit of the Origination Clause is whether raising revenue for

the general Treasury is that provision's primary purpose.  *See United States v. Munoz-Flores*, 495 U.S. 385, 399 (1990); *see also Twin City Nat'l Bank v. Nebeker*, 167 U.S. 196, 203 (1897); *Millard v. Roberts*, 202 U.S. 429, 436-37 (1906).  The panel opinion rests on the purposive reading adopted and applied by the Supreme Court in these three cases.

**A.**

*Munoz-Flores*, the Supreme Court's most recent pronouncement on the Origination Clause, restated that "a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support Government generally, is not a Bill for raising Revenue within the meaning of the Origination Clause."  495 U.S. at 398 (internal quotation marks and brackets omitted).  The dissent quotes that language, but then adds a new and different test by which a statute could escape the requirements of the Origination Clause only if it raises funds "designated for use in a specific program," and does not "raise revenues paid into the general treasury and available for general governmental use[]."  Dissent 17-20.  The Court in *Munoz-Flores*, however, described and followed *Nebeker*'s holding that "a bill creating a discrete governmental program and providing sources for its financial support is not a revenue bill simply because it creates revenue."  495 U.S. at 400.  The Court could have been talking about the ACA.

The dissent nonetheless argues that this court should convene *en banc* to announce that the holdings in *Munoz-Flores*, *Millard*, and *Nebeker* are narrower than the purposive test expressly employed by the Supreme Court.  Those cases, the dissent contends, establish only a very limited exception

to the Origination Clause for taxes designated exclusively for use by a specific program or service. Dissent 17-20. That argument relies on a faulty premise. The cases considered by the Supreme Court involved revenue-generating measures that supported identified government programs or services but that were not designated by law for exclusive use by the particular program or service, and in any event none of them was resolved on the grounds proposed by the dissent.

*Munoz-Flores* concerned a challenge to a law imposing a "special assessment" on any person convicted of a federal misdemeanor, with the proceeds up to a threshold amount deposited into a Crime Victims Fund, and any surplus beyond the threshold deposited into the general fund. 495 U.S. at 398-99. The dissent observes that "[t]he Court first swept [the general fund spillover] scenario aside as one that would rarely occur in practice." Dissent 20-21. The *Munoz-Flores* Court did sweep that scenario aside, though it could do so only because it was engaged in an interpretation of the law's "primary purpose" rather than because assessments paid would never go into general revenue. 495 U.S. at 399; *see also* Minor and Technical Criminal Law Amendments Act of 1988, Pub. L. No. 100-690 § 7121, 102 Stat. 4419, 4422 (1988) (codified at 42 U.S.C. 10601(c)(1)(A) (1988)) (stating that if the Crime Victims Fund hits a specified ceiling in deposits in any given year, the excess "shall be deposited in the general fund of the Treasury."). In fact, *Munoz-Flores* expressly acknowledged that some of the law's proceeds *already* had gone to general revenue. 495 U.S. at 399. The case cannot support the dissent's bright-line test.[1]

---

[1] Indeed, the Supreme Court in *Munoz-Flores* affirmatively rejected the test that the Ninth Circuit had adopted, and that the dissent

*Nebeker* involved three bank taxes in Section 41 of the National Bank Act of 1864, ch. 106, 13 Stat. 99, 111 (1864), that allegedly originated in the Senate. *Nebeker*, 167 U.S. at 202-03. The taxes, due every six months, required that each bank pay a half percent tax on the "average amount of its notes in circulation," a quarter percent tax on the "average amount of its deposits," and a quarter percent tax on the "average amount of its capital stock beyond the amount invested in United States bonds." *Id.* at 199 (quoting 13 Stat. at 111). The principal purpose of the National Bank Act was "to provide a national currency based upon United States bonds," *id.* at 203, and the Act provided that the expenses of the Office of the Comptroller of the Currency would be paid from the taxes in the Act, *see id.* at 199-200. But it is not the case, as the dissent asserts, that "all of the funds raised were designated by law to be used to pay the costs of printing and distributing currency." Dissent 18.

---

today commends, under which any Senate-originated bill that in fact raises funds for "general revenue" violates the Origination Clause. *See* 863 F.2d 654 (9th Cir. 1988), *rev'd*, 495 U.S. 385 (1990). The Court of Appeals for the Ninth Circuit had held in *Munoz-Flores* that the special assessment made its legislative vehicle a revenue bill because "Congress contemplated that the revenue might be used as general federal revenue" and "Congress failed to restrict the use of the monies assessed . . . in any way, so that they might be shifted to another purpose at any time." 863 F.2d at 659. The Supreme Court disagreed, stating that "a bill creating a discrete governmental program and providing sources for its financial support is not a revenue bill simply because it creates revenue." 495 U.S. at 400.

The Act at issue in *Nebeker* placed no restriction on how funds raised in excess of those needed for maintaining the currency would be spent. The taxes at issue in *Nebeker* were to be paid "to the treasurer of the United States" "in lieu of all existing taxes." 167 U.S. 198-99 (quoting 13 Stat. at 111). The statute directed that the "expenses of the [currency] bureau" were to be paid from the money raised. *Id.* But, other than that requirement, the Act placed no limitation on the use of any excess funds. *Id.* As things turned out, there was a great deal of excess. The Secretary of the Treasury's most recent annual report at the time the Supreme Court decided *Nebeker* reflected that $1.763 million had been collected in the first half of that year through the tax on national banks. *Annual Report of the Secretary of the Treasury on the State of the Finances for the Year 1896*, at XIX (GPO 1897). The Secretary recommended that the tax be cut in half. *Id.* at XXXIII. The Comptroller of the Currency's own contemporaneous annual report explained that this was because the tax collected funds "beyond any possible need of the Government." *Annual Report of the Comptroller of the Currency to the Second Session of the Fifty-Fourth Congress*, at 105 (GPO 1896). When the new Federal Reserve System displaced national bank notes in 1914, and the Comptroller ultimately accounted for the life of the circulation tax, he reckoned that $126 million had been collected from the circulation tax alone while the expenses of the Currency Bureau had been only $15 million. 1 *Annual Report of the Comptroller of the Currency to the Third Session of the Sixty-Third Congress*, at 55 (GPO 1915). The circulation tax raised billions in today's dollars. One could say—borrowing words used by today's dissent—that the Bank Act "raise[d] revenue. Lots of revenue." Dissent 1.

The Supreme Court nonetheless held in *Nebeker* that the taxes did not implicate the Origination Clause because they were "in the furtherance of [the] object" of the Act: "providing a national currency." *Nebeker*, 167 U.S. at 202. The Court said it was conclusive that:

> [t]he *main purpose* that congress had in view [in enacting the National Bank Act] was to provide a national currency based upon United States bonds, and to that end it was deemed wise to impose the tax in question. The tax was a means for effectually accomplishing the great object of giving to the people a currency that would rest primarily upon the honor of the United States, and be available in every part of the country. There was no purpose by the act, or by any of its provisions, to raise revenue to be applied in meeting the expenses or obligations of the government.

*Id*. at 203 (emphasis added). The taxes in *Nebeker* had the effect of raising substantial general revenues, but that was not the purpose—the "great object"—of the law, and so the Origination Clause was not implicated. *See, e.g.*, 1 Westel Woodbury Willoughby, *The Constitutional Law of the United States* § 251, p. 566 (1910) ("[I]n [*Nebeker*] the court, in effect, held that a bill, the primary purpose of which is not the raising of revenue, is not a measure that must originate in the House, even though, incidentally, a revenue will be derived by the United States from its execution.").

Similarly, in *Millard*, the Supreme Court held that three laws relating to railroad improvements and expansion in the District of Columbia did not implicate the Origination Clause. 202 U.S. at 434-35. One of the laws at issue provided, in

relevant part, that the costs of making the improvements the Act contemplated would be paid "[f]ifty per centum . . . by the United States and the remaining fifty per centum . . . by the District of Columbia, which last-mentioned fifty per centum shall be levied and assessed upon the taxable property and privileges in said District other than the property of the United States and of the District of Columbia."  31 Stat. 767, 771, 773-74 (1901).  The other two statutes also provided that "half" of the costs of various sorts of improvements would "be paid out of the revenues of the District of Columbia," 31 Stat. 774, 779 (1901), or "by the District of Columbia," 32 Stat. 909, 918 (1903).  The case is frequently described as imposing "a tax on property in the District of Columbia." Dissent 19.  As the statutory language appears to show, however, the three laws challenged in *Millard* did not in themselves specify or levy taxes.

The *Millard* court of appeals thought the appellant charged the Senate with unconstitutionally originating an appropriations bill.  25 App. D.C. 221, 223-24 (1905), *aff'd*, 202 U.S. 429 (1906).  It disposed of the case on the ground that sustaining a challenge to "a bill plainly for another purpose, and which only incidentally carries an appropriation with it in order to give it effect" would mean that "possibly one half or three fourths of the legislation of Congress would be null and void." *Id.*

The Supreme Court in *Millard* took a different tack, calling the bill a tax but summarily rejecting the appellant's claim.  The Court held that whether the challenged bill anticipated future taxes or somehow levied taxes did not matter, because "[w]hatever taxes are imposed are but means to the purposes provided by the act."  202 U.S. at 437.  The taxes were instrumental to the accomplishment of the

statutory purpose—railroad improvements. The Court thus thought the challenge easily dismissed: "In answer to the [Origination Clause] contention the case of [*Nebeker*] need only be cited." *Id.*

*Millard*'s brevity offers an important clue in unpacking the Supreme Court's adherence to a purposive approach to the Origination Clause. The Court thought the issue so clear-cut in *Millard* that it dismissed the case on purpose grounds rather than on the ground that the statute simply did not impose any taxes (but at most described future taxes). Were designation truly the test of the Origination Clause's scope, *Millard* would have been a far more difficult case. *Millard* might or might not have involved designation; it might or might not have reviewed a bill levying new taxes. The Court in *Millard* did not dismiss the case because the bill under review imposed no tax, nor because the taxes were in any way explicitly designated, but because the taxes were "but means to the purposes provided by the act." 202 U.S. at 437. Under that analysis, the ACA readily survives Sissel's Origination Clause challenge.

**B.**

The purpose of the ACA was to overhaul the national healthcare system, not to raise revenue. It provided for a "shared responsibility payment," 26 U.S.C. § 5000A, to support the law's programmatic goals by encouraging people to purchase insurance and by helping to fund the overall program. *See NFIB v. Sebelius*, 132 S. Ct. at 2585 (describing the mechanics of the shared responsibility payment as the solution to cost-shifting problems in the national health insurance market).

The ACA enacted that mandate as part of three key reforms in the national health insurance market. The Act (1) bars insurers from denying coverage to any person because of a preexisting condition (a reform called "guaranteed issue") and prohibits charging people with preexisting conditions higher premiums than those without (a reform called "community rating"), (2) enacts market-expanding reforms to ensure large enough risk pools through a "coverage mandate" to prevent health insurance premiums from skyrocketing, and (3) provides refundable tax credits to individuals in order to make insurance more affordable. *See King v. Burwell*, No. 14-114, slip op. at 4-5 (U.S. June 25, 2015). The centerpiece of the market-expanding reforms is a requirement that individuals purchase insurance, supported in part by the tax subsidies where needed. *See id.* A mandate that people lacking insurance pay to the government a "shared responsibility payment" is designed to encourage individuals to buy coverage.

As the Supreme Court emphasized in its recent *King v. Burwell* opinion interpreting a key provision of the ACA, that law's "three key reforms" are "closely intertwined." *Id.* at 4. The Court explained that "[a] fair reading of legislation demands a fair understanding of the legislative plan" and Congress's legislative plan in passing the ACA was to "improve health insurance markets" by making coverage more accessible and affordable. *Id.* at 21. *King* reinforces the Supreme Court's holding in *NFIB*, and the panel's conclusion in this case, that the individual mandate is part of a package of reforms Congress deemed essential to the ACA's main purposes of "expand[ing] coverage in the individual health insurance market" and "ensur[ing] that anyone who wanted to buy health insurance could do so." *Id.* at 1, 2.

The dissent objects that the shared responsibility payment will raise too much money for it to count as just a piece of a larger, more comprehensive whole.[2] The dissent forefronts the size of the numbers involved, highlighting one early Congressional Budget Office estimate of the billions of dollars the ACA would raise over ten years. Dissent 1, 8-9. It is unclear what those numbers could add to the claim that the ACA raises revenue; they are gross figures, not net of the costs of providing the health insurance coverage and health care for which the ACA was enacted. Any time Congress enacts an ambitious, nationwide reform that includes a mechanism to pay for itself, the numbers will be large. But program size does not establish a revenue-raising purpose or effect. The purpose of the ACA is to give back what it generates, in the form of broader, more effective, and fairer health coverage, not to raise revenue for general governmental obligations.

The dissent does not contend that the purpose of the ACA or its shared responsibility payment was to raise revenue. *Id.* The dissent nonetheless points out that there are taxes in the ACA other than the shared responsibility payment. *Id.* But only the shared responsibility payment was alleged as the basis for the Origination Clause claim in this case.[3] In any

---

[2] The dissent suggests that it "makes little sense" for the panel to conclude that the Origination Clause "magically" does not apply to the ACA even though, had the ACA been two bills, a tax bill and a spending bill, the Origination Clause would have applied to the tax bill. Dissent 11. The same criticism could have been leveled against the bills at issue in *Munoz-Flores*, *Millard*, and *Nebeker*.

[3] Rehearing is not appropriate on an issue that no party raised, briefed or argued to the panel, the panel did not consider, and that

event, the dissent's examples of Senate-originated laws that should implicate the Origination Clause all involve Senate bills with tax provisions that are unrelated to the purposes of the bill or have revenue-raising as the Senate's sole purpose. *Id.* at 10, 20. The dissent mentions, for example, that the Senate might attempt to attach a gas tax to a major national security bill, *id.* at 10, or raise income taxes to offset the costs of fighting a war, *id.* at 20. The panel opinion does not, and need not, opine on how the Origination Clause might apply to a bill containing revenue-raising provisions unrelated to its non-revenue objectives.

The dissent does not contend, nor are we aware of any credible suggestion, that the purpose of the ACA, including its revenue provisions, was other than to reform the nation's market for health care, including by encouraging individuals to purchase health insurance and by supplying subsidies to make those purchases affordable. Sissel has not identified any provision in the ACA that he asserts is unrelated to its overarching purpose. This is not a case in which the Senate originated an omnibus bill packed with revenue provisions bearing no apparent relationship to any other aspect of the bill. Whatever novel questions such a bill would raise, they are far afield from this case, which is easily decided under the Supreme Court's precedents.

The dissent skillfully strives to square its view of the Origination Clause with the Supreme Court's precedents. Its basic position is that "any provision" of a law that raises

was not even advanced in the losing party's petition for rehearing. *See King v. Palmer*, 778 F.2d 878, 883 (D.C. Cir. 1985) (Bork, J., concurring in denial of rehearing *en banc*).

revenue for general governmental purposes comes within the Origination Clause. *Id*. at 23 n.5. It quickly acknowledges that rule is too broad. Acts to sell public lands, trade bills, and laws that fix the price of stamps, among many others, have always fallen outside the Clause. So have several types of laws that actually levy taxes. To align its rule with precedent, the dissent defines an exception to the general rule: laws creating distinct governmental programs fall outside the Clause, but only if they designate the money they raise for a separate fund to pay their costs. *Id.* at 17-20. The dissent sees that even that rule still sweeps too wide. The Supreme Court has held at least twice that laws that paid into the general Treasury fell outside the Clause. To make it work, the dissent locates another exception: Laws that do not raise "substantial" revenue for the Treasury are also not subject to the Clause. *Id.* at 20-22.

Those rules and their exceptions do not reflect the law. The dissent insists that it must matter to the Constitution whether a bill expressly designates its revenues for use by a particular government program. No case has ever said that it must. The Court has instead cautioned that "[w]hat bills belong to that class [of bills for raising revenue] is a question of such magnitude and importance that it is the part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject." *Nebeker*, 167 U.S. at 202. The dissent yearns for just such a general statement. But there is no need for one in this case.

It bears repeating that, in all of our history, the Supreme Court has not once found a law in violation of the Origination Clause. The Court has said Origination Clause challenges are justiciable, and the panel's opinion stayed in the lane in which the Court has authorized judicial review.

**II.**

In deciding this case, the panel saw no need to go further than application of the relevant Supreme Court precedent. Our court exercises its *en banc* power sparingly; its exercise of that power to change the reasoning in correctly decided cases is rarer still. We think the dissent, in arguing for rehearing now, seeks to revisit Origination Clause doctrine in ways squarely foreclosed by that precedent and unsupported by the Constitution's history and text. Even setting aside that these are not open issues, we see problems with the dissent's treatment of several of them, which we address in turn.

**A.**

First, the dissent would reach the same conclusion that the Court did on a different basis. It reasons that H.R. 3590, the legislative vehicle that became the Affordable Care Act, was a revenue-raising bill that originated in the House. Dissent 3, 24-28 & n.6. To get there, it rests on *Rainey v. United States* for the proposition that, as long as a Senate amendment is "an amendment to a bill for raising revenue which originated in the House[,] [t]hat is sufficient" for it to comply with the Origination Clause. 232 U.S. 310, 317 (1914). *Rainey*, the dissent tells us, "is squarely on point and has never been overruled." Dissent 28.

If there was no reason to doubt that approach, we agree that it could be a ready, additional way to decide this case, either in the first instance or as an alternative holding. But we decided against relying on it, in large part because the holding of *Munoz-Flores*—the Supreme Court's most recent examination of the issue—was based on a different analysis.

The Court chose its approach over an alternative developed in Justice Scalia's passionate concurrence in the judgment, which would have decided that case as the dissent proposes to approach this one. *See* 495 U.S. at 391-92 & n.4; *id.* at 408 (Scalia, J., concurring in the judgment). Quite simply, *Munoz-Flores* insisted on basing the holding upon the purpose of the bill rather than the chamber where the bill began, and because the Court's latest analysis of the Origination Clause is instructive (if not binding), we believe the proper course is to follow that example.

We ultimately decided not to address the scope of the Senate's power to amend House-originated Bills because *Munoz-Flores* and the Supreme Court's other cases delineating the scope of the Origination Clause provided a clear path to the proper resolution of Sissel's contention.

**B.**

The dissent also contends that the text of the Origination Clause forecloses the approach that the Supreme Court has used for more than a century and that we applied in this case. Instead, the dissent states: "If any provision of the law raises revenue for general governmental purposes, then the Origination Clause applies." Dissent 23 n.5. It explains:

> The text of the Clause does not exempt bills that also accomplish other objectives or serve other predominant purposes. As long as the bill raises revenue, the text of the Clause requires that the bill originate in the House.

*Id.* at 13.

To the contrary, the text of the Origination Clause supports the Supreme Court's purposive approach. The text of the Clause provides that:

> All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

U.S. Const. art. I, § 7, cl. 1. The Clause's critical word for this analysis is "for." The word "for" in this context means "with the purpose or object of." *See Webster's Third New International Dictionary of the English Language* 886 (1981); *see also* Samuel Johnson, *A Dictionary of the English Language* 353 (10th ed. 1792) (defining the word "for" as meaning, among other things, "with intention of").

The text of the Origination Clause supports the purposive reading reflected in the Supreme Court's decisions. The dissent's textual analysis ignores that the word "for" applies to the purpose of a "Bill," not to any single provision of it. The grammatical reading of the text of the Origination Clause is that it only reaches bills that have raising revenue as their purpose or object. If it were meant to apply to all bills that raised revenue, the Origination Clause would read "All Bills that raise Revenue" shall originate in the House. The purposive reading of the Origination Clause's text also aligns the Clause's textual meaning with the Supreme Court's precedents, which have consistently held that bills whose primary purpose is to raise revenue must originate in the House, while all other bills may originate anywhere.

In contrast, if the dissent is right about what the Clause's text means, the Supreme Court's cases have to be wrong

about it.  The dissent admits that.  Dissent 21-22.  As the dissent explains:  "[S]ome might say that the *Nebeker-Millard-Munoz-Flores* line of cases" are "inconsistent with the constitutional text because the laws in those cases did raise money, even though the money was designated by law for specific programs."  *Id.*  The dissent says there is a "straightforward" explanation for that seemingly fatal incongruity:  In *Nebeker*, *Millard*, and *Munoz-Flores* the Court carved out "narrow" exceptions to the Clause's text for "compelling" reasons supported by "history."  *Id.* at 22.  As discussed above, the Supreme Court's decisions are better read as consistent with the Constitution's text.

## C.

The dissent points out that the House has "blue-slipp[ed]" revenue-raising bills with regulatory purposes.  *Id.* at 15.  But the House has interpreted the Origination Clause far more broadly than even the dissent believes is appropriate.  The practice of the House supports neither the panel nor the dissent—its method differs from both.  The House of Representatives has charted its own path.  That is its prerogative.  It does little to clarify the question now before us.

The House has cited the Origination Clause in returning to the Senate bills that appropriate funds, *see* 3 Lewis Deschler, *Deschler's Precedents of the United States House of Representatives* ch. 13, §§ 20.2, 20.4 (1994), ban certain imports, *see* 138 Cong. Rec. 3377 (Feb. 25, 1992); 145 Cong. Rec. H5677-80 (July 15, 1999), adjust import quotas, *see Deschler's Precedents* ch. 13, § 15.4, and that *reduce* revenue by granting tax exemptions, *see id.*, §§ 15.3, 18.5.  Recently, the House blue-slipped a Senate bill that would have repealed

a fee whose proceeds, like those in *Munoz-Flores* and *Nebeker*, were designated to pay for a particular nuclear waste disposal program and were deposited into the general fund of the Treasury only after they exceeded the cost of the program. *See* 144 Cong. Rec. H878-79 (Mar. 5, 1998).

The House thus has considered the Clause to apply well beyond the lines drawn by the Supreme Court, the panel in this case, and the dissent. The House may well continue to do so, and it retains the means by which to enforce its own interpretation of the Clause. But, as a result, its practice does not provide support for the dissent's designation approach.

**D.**

The dissent claims that the Origination Clause "reflects a deliberate choice made by the Framers at Philadelphia." Dissent 13. It cites the views of two individual Framers and declares they "might as well have been speaking about the Affordable Care Act." *Id.* The Constitution certainly reflects deliberate choices, but it is not at all clear that the dissent has correctly analyzed the choices reflected in the Origination Clause. The historical evidence best supports the Supreme Court's purposive interpretation.

What began as a requirement that "all money bills of every kind shall originate in the House of Delegates & shall not be altered by the Senate" eventually evolved into the relatively limited prohibition on Senate origination of bills for raising revenue that we have today. *See* Thomas L. Jipping, *TEFRA and the Origination Clause: Taking the Oath Seriously*, 35 BUFF. L. REV. 633, 661-62 & n.146 (1986). The scope of the Origination Clause "underwent a narrowing of focus from concerning 'all money bills' to 'bills for raising

revenue' through the course of the [constitutional] convention." *Id.* at 662. The narrowing was consequential: "Successive versions of the clause show that the specific powers contained in its original version were given up only when it was clear that success of the convention required it." *Id.* at 661.

There is weighty evidence the Clause's use of the phrase "for raising revenue" was meant to establish a purposive standard. On two occasions near the end of the Constitutional Convention, supporters of the Clause proposed language that expressly limited its reach to bills enacted for the purposes of raising revenue. *See 2 The Records of the Federal Convention of 1787*, at 294-97, 266-80 (Max Farrand ed., 1911) (hereinafter *Farrand's Records*). Opponents of the Clause expressed no opposition to its narrowing, but focused their criticisms on the absence of a Senate amendment power and the Clause's prohibition on Senate appropriations. *See, e.g.*, *id.* at 224, 274-80. That history suggests that the Origination Clause's "All Bills for raising Revenue" language was meant to condense the purposive language put forward by the Clause's proponents near the close of the Convention— "for the purposes of revenue"—but not to change its meaning.

The Constitutional Convention's critical compromises concerning the language and scope of the Origination Clause occurred in its closing weeks, between mid-August and early September 1787. As of mid-August, proponents of the initial, broader version of the Origination Clause were on the defensive. On August 6, the Committee of Detail—of which Edmund Randolph, a strong supporter of the Origination Clause, was a prominent member—put forward its draft proposal for the Constitution. That draft included the language: "All bills for raising or appropriating money . . .

shall originate in the House of Representatives, and shall not be altered or amended by the Senate." *Id.* at 178 (Aug. 6, 1787); *see also* William Ewald, *The Committee of Detail*, 28 CONST. COMMENT. 197 (2012) (describing circumstances surrounding the Committee of Detail's draft).

Two days later, a coalition of delegates came together to strike the Clause from the draft of the Constitution, and succeeded in doing so by a vote of 7-4. 2 *Farrand's Records* at 210-11 (Aug. 7, 1787); *id.* at 214 (Aug. 8, 1787). The Clause's opponents saw it as a needless landmine, one that could seriously weaken the new national government by investing too much power in what they viewed as the less independent, less expert, and less responsible of the two chambers of Congress, while generating pointless gridlock and mortally weakening the Senate. *See, e.g.*, *id.* at 224 (Aug. 8, 1787) (summarizing objections of Pinkney, Mercer, and Madison, the last of whom "was for striking it out: considering it as of no advantage to the large States as fettering the Govt. and as a source of injurious altercations between the two Houses"); *id.* at 274-80 (Aug. 13, 1787) (summarizing additional objections of Wilson, Morris, Madison, Carrol, Rutledge, and McHenry to a similar version of the Origination Clause five days later).

The Origination Clause's proponents, in an effort to resuscitate it, suggested circumscribed language that they hoped would reinstate its core. On August 11, Edmund Randolph successfully moved to have the Clause reconsidered:

> [Randolph] signified that he should propose instead of the original Section, a clause specifying that the bills in question should be for the purpose of Revenue, in

order to repel ye. objection agst. the extent of the words "*raising money*," which might happen incidentally, and that the Senate should not so amend or alter as to increase or diminish the sum; in order to obviate the inconveniences urged agst. a restriction of the Senate to a simple affirmative or negative.

*Id.* at 263 (Aug. 11, 1787). That motion for reconsideration passed by a vote of 9-1. *Id.* Randolph's amended Origination Clause read:

[A]ll bills for raising money for the purposes of revenue, or for appropriating the same, shall originate in the House of representatives; and shall not be so altered or amended by the Senate, as to encrease or diminish the sum to be raised, or change the mode of raising or the objects of [its] appropriation.

*Id.* at 266 (Aug. 13, 1787). Speaking in favor of the revised Origination Clause, George Mason explained that "[b]y specifying *purposes of revenue,* it obviated the objection that the Section extended to all bills under which money might incidentally arise." *Id.* at 273 (Aug. 13, 1787) (emphasis in original).

Elbridge Gerry, probably the most ardent supporter of a stronger Origination Clause, expressed displeasure with Randolph's narrowing and indicated it conceded too much. In the debate over the new, narrower Origination Clause, Gerry cautioned: "[A]cceptance of the plan will inevitably fail, if the Senate be not restrained from originating Money bills." *Id.* at 275. After substantial debate, the Convention rejected Randolph's amended language by a vote of 7-4. *Id.* at 266 (recording votes taken Aug. 13, 1787).

James Madison also spoke in that exchange. Madison was against the inclusion of an Origination Clause. He had said only five days earlier, with respect to a prior, broader version that he "was for striking it out." *Id.* at 224 (Aug. 8, 1787).

Madison explained that he thought Randolph's amendments to the Clause did little to repair it. *See id.* at 276-77 (Aug. 13, 1787). Randolph's suggested purposive language, he argued, would not prevent "contention & faction," and it could create "difficulties and disputes between the two houses." *Id.* at 276 (Aug. 13, 1787). Even if limiting purposive language were inserted, the House could still insist that Senate-originated trade bills were actually disguised bills for raising revenue. *See id.* Randolph's purposive language would not prevent the two Houses from clashing over which bills were subject to the Clause. *See id.* In Madison's view, the purposive language was not enough of an improvement. *See id.* at 276-77.

The dissent leans on Madison's remarks, but concludes they express views opposite to those Madison held. *See* Dissent 13-15. The dissent sees in Madison's words a ringing rejection of a purposive Origination Clause, not just by Madison, but the whole Convention. Two flaws in that account are especially pertinent.

First, Madison opposed Randolph's purposive language not because he favored a broader Clause (as the dissent implies) but because he opposed the Clause entirely, and thought the purposive language did not meaningfully narrow it. The dissent's error is in thinking that Madison was against the language when in fact he was against the Clause, and thought the language too limited a fix to persuade him to support it. *See* Dissent 13-15 & nn.3-4.

Second, the dissent overlooks that, whatever Madison thought, supporters of the Clause—those that most wanted it in the Constitution—thought that a purpose-based limitation was a compromise on which all sides could agree. The dissent pins its argument that the Convention rejected the purposive Origination Clause on two sentences by Madison. The dissent overlooks entirely that Madison thought a non-purposive Clause would be equally unworkable, 2 *Farrand's Records* at 276-77 (Aug. 13, 1787); *id.* at 224 (Aug. 8, 1787), that discussion of the Origination Clause did not begin or end with Madison's remarks, and that when its supporters regrouped and reintroduced the Clause thereafter, they left the purposive language intact.

Following the rejection of Randolph's proposal on August 13, Caleb Strong moved on August 15 to introduce language substantially similar to Randolph's, except that it also authorized the Senate to amend House-originated bills passed "for the purposes of revenue." *Id.* at 294, 297. The revised language of the Origination Clause read:

> Each House shall possess the right of originating all Bills except Bills for raising money for the purposes of revenue or for appropriating the same and for fixing the salaries of the Officers of Government which shall originate in the House of representatives; but the Senate may propose or concur with amendments as in other cases.

*Id.* at 294. The Convention postponed consideration of the motion to amend the relevant Section by a vote of 6-5. *Id.* On August 21 it again deferred consideration of the Amendment. *Id.* at 357-58.

On August 31, those parts of the draft Constitution that had been postponed were referred to a committee called the Committee of Eleven, composed of a Convention member from each state. *See id.* at 473, 481 (Aug. 31, 1787) (listing Committee members and purpose of the Committee). On September 5, the Committee reported out a version of the Origination Clause almost identical to the modern Clause. It included the important requirement that "all Bills for raising Revenue" would originate in the House of Representatives, along with language permitting the Senate to amend such bills. *Id.* at 505 (Sept. 5, 1787). The convention finalized the Clause three days later by slightly amending the language governing the Senate's amendment authority. *Id.* at 552 (Sept. 8, 1787). The Convention settled on that language by a vote of 9-2, *id.*, and signed the Constitution nine days later, on September 17, 1787.

The final language of the Clause employs a word ("for") that is widely recognized as a synonym for the words "for the purposes of"—the very language the proponents of the narrowed substitute Clause had suggested. *See id.* at 263 (Aug. 11, 1787) (Randolph's proposed language: "All bills for raising money for the purposes of revenue"); *id.* at 294 (Aug. 15, 1787) (Strong's proposed language: "Bills for raising money for the purposes of revenue"). That evidence suggests that the Supreme Court's purposive reading of the Origination Clause is the reading the Framers intended.

The dissent misses that substitution of the Constitution's "for raising revenue" language for its "for raising money for the purposes of revenue" language occurred in a context making clear that it was a stylistic change, not a substantive one. The Committee of Eleven that proposed much of the Constitution's final text primarily regarded the question

before it as whether to include the Clause at all. *See* Charles Warren, *The Making of the Constitution* 668-71 (1937). Ultimately, the Committee chose to include the Origination Clause in exchange for investing the Senate with the power to choose the President when a majority of the electors were not united for any candidate.[4] *Id.* at 669 (explaining that "to conciliate those who would be inclined to oppose such an increase of power in the Senate" the Committee adopted "the suggestion which Caleb Strong had made as to revenue bills"). The slight change from Caleb Strong's proposed wording brooked no recorded comment whatsoever when placed before the Convention, *see* 2 *Farrand's Records* at 508-10 (Sept. 5, 1787), and the Convention specifically adopted the Clause's "for raising Revenue" language by a vote of 9-2. *Id.* at 545, 552 (Sept. 8, 1787). One would hardly expect such a united and amicable outcome if the scope of the Clause remained an issue. The foregoing is powerful evidence that the Committee of Eleven did not quietly broaden the Origination Clause's scope in early September. The best reading of the history is that the Convention finalized the scope of the Clause in mid-August (when it debated the Clause's purposive language) and delegated to the Committee of Eleven the more limited question whether or not to include it in the Constitution at all. *See* Warren, *supra* at 668-71.

---

[4] The Convention rejected the Senate-empowering half of the Committee's compromise and placed in the House of Representatives the power to choose the President when a majority of the electors were not united for any candidate. *See* U.S. Const. art. II, § 1, cl. 3; 2 *Farrand's Records* at 519, 527, 531 (Sept. 6, 1787); 1 George Ticknor Curtis, *Constitutional History of the United States* 457 (1889).

What of the dissent's reliance on statements by Elbridge Gerry and James Madison praising a seemingly broader Origination Clause?  The version Gerry championed is not in the Constitution.   Gerry criticized the Constitution for rejecting his vision of the Origination Clause, and he cited that rejection as a reason why he refused to sign the Constitution and advocated against its ratification.  *See* Letter of Elbridge Gerry to the Vice President of the Convention of Massachusetts (Jan. 21, 1788), *reprinted in* 3 *Farrand's Records* at 265.  Madison extolled the Origination Clause in Federalist 58, not because it gave the House power over all taxes, but because, in his opinion, it vested the House with exclusive power to originate appropriations bills.  *See The Federalist No. 58*, at 359 (James Madison) (Clinton Rossiter ed., 1961) (explaining that the House's power would derive from its "power over the purse").  Neither "revenue" nor "tax" is mentioned in Federalist 58.  *Id.* at 356-61.  And at the Convention itself, Madison appeared vocally to oppose the Clause.  *See* 2 *Farrand's Records* at 224 (Aug. 8, 1787); *id.* at 276-77 (Aug. 13, 1787).

Because the Supreme Court has instructed us how to decide Origination Clause questions, this case presents no occasion for a comprehensive historical inquiry.  But even the modest look we take here demonstrates that the gloss given by the dissent is wide of the mark.

**E.**

In addition to evidence from the framing and ratification, early constitutional history confirms that the Origination Clause's expected application was through a purpose-based test.  St. George Tucker, writing in 1803 in the first major treatise on American law, argued that the Origination Clause

should be read in light of English practice and therefore sweepingly construed to prevent the Senate from raising revenue through even "indirect modes of taxation" such as "debasing the value of the coin." St. George Tucker, *Blackstone's Commentaries* 261 (1803). Tucker, however, was forced to acknowledge, in a lengthy footnote, that the practice of the first Congresses had already shown that those bodies thought the Origination Clause was quite narrow, and that laws that raised revenue, even "to a very considerable amount," did not implicate the Origination Clause unless "revenue was intended to be drawn to the government by these laws." *Id.* at 261 n.§ (1803).

Justice Joseph Story, writing in 1833 in his own *Commentaries on the Constitution*, commented on Tucker's treatment of the Origination Clause, explaining that "[a] learned commentator[, Tucker,] supposes, that every bill, which indirectly or consequentially may raise revenue, is, within the sense of the constitution, a revenue bill." 2 Joseph Story, *Commentaries on the Constitution* § 877, at 343 (1833). Justice Story went on to explain that "the practical construction of the constitution has been against his opinion," *id.*, and that "the history of the origin of the power, already suggested, abundantly proves, that it has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes, which may incidentally create revenue," *id.*

Justice Story's views form the basis of controlling precedent in this court and in the Supreme Court. In deciding the first appeal of *Nebeker*, this court quoted extensively from Justice Story's *Commentaries on the Constitution*. The opinion noted Story's recognition that there were two views of the Origination Clause: a view that "supposes that every

bill which indirectly or consequentially may raise revenue is, within the sense of the Constitution, a revenue bill," and the superior view that "it has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes, which may incidentally create revenue." 3 App. D.C. at 201 (quoting 1 Joseph Story, *Commentaries on the Constitution* § 880); *see also United States v. Norton*, 91 U.S. 566, 569 (1875) (citing Justice Story's views approvingly). The Supreme Court concluded, as we did then and must again here, that the latter view was correct. 167 U.S. 196, 202 (adopting Justice Story's views); *see also Millard*, 202 U.S. at 436 (treating Justice Story's views as having been adopted by the Supreme Court in *Nebeker*). Justice Story's comments on Tucker have been quoted in Supreme Court opinions on the Origination Clause, often as grounds for holding that the law at issue does not come within the scope of the Clause. *See Munoz-Flores*, 495 U.S. at 397; *Millard*, 202 U.S. at 436.

Early congressional practice, recognized by two of America's most influential early constitutional scholars and endorsed by one of them (Story), strongly suggests that the original expected application of the Origination Clause was purposive. Most importantly, in our view, that is the approach that was adopted and has been reaffirmed by the Supreme Court.

\* \* \*

For these reasons, the dissent from the denial of rehearing *en banc* presents no basis for the *en banc* court to revisit the holding that Sissel's challenge to the mandate in section 5000A of the Affordable Care Act does not come within the scope of the Origination Clause. In adhering to Supreme

Court precedent adopting a purposive interpretation, the panel opinion honors the balance of power between the two Houses of Congress as envisioned by the Framers, thereby safeguarding individual liberty. There is no basis for the dissent's accusation to the contrary. *See* Dissent 22-23. The court has correctly voted to deny rehearing *en banc*.

KAVANAUGH, *Circuit Judge*, with whom *Circuit Judges* HENDERSON, BROWN, and GRIFFITH join, dissenting from the denial of rehearing en banc: This case raises a serious constitutional question about the 2010 Affordable Care Act, one of the most consequential laws ever enacted by Congress. Did Congress's enactment of the Act comport with the Origination Clause of the Constitution? The Origination Clause provides: "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." U.S. Const. art. 1, § 7, cl. 1. The Origination Clause therefore requires that bills for "raising Revenue" originate in the House of Representatives. Revenue bills may be amended in the Senate "as on other Bills," but they must originate in the House. If the Affordable Care Act did not meet the requirements of the Origination Clause, then the Act – or at least revenue-raising provisions such as the individual mandate – must be invalidated.

In my view, the Affordable Care Act complied with the Origination Clause, but not for the reason articulated by the three-judge panel opinion. The panel opinion concluded that the Affordable Care Act was not a revenue-raising bill for purposes of the Origination Clause and therefore did not have to originate in the House. In my respectful view, that conclusion is untenable. The Affordable Care Act established new subsidies for the purchase of health insurance and expanded the Medicaid program for low-income Americans. Those new subsidies and expanded entitlements cost an enormous amount of money. So as not to increase the annual budget deficit and the overall national debt, the Act imposed numerous taxes to raise revenue. Lots of revenue. $473 *billion* in revenue over 10 years. It is difficult to say with a straight face that a bill raising $473 billion in revenue is not a "Bill for raising Revenue."

The Affordable Care Act therefore was a revenue-raising bill subject to the Origination Clause. That said, the Act did

in fact originate in the House, as required by the Clause. Although the original House bill was amended and its language replaced in the Senate, such Senate amendments are permissible under the Clause's text and precedent.

So in concluding that the Affordable Care Act complied with the Origination Clause, the panel opinion reached the right bottom line, but relied on what I see as a faulty rationale. Does such a case still warrant en banc review? Oftentimes no, but here yes. The panel opinion sets a constitutional precedent that is too important to let linger and metastasize. Although no doubt viewed by some today as a trivial or anachronistic annoyance, the Origination Clause was an integral part of the Framers' blueprint for protecting the people from excessive federal taxation. It is true that the Framers' decision to grant the Senate a broad amendment power gave the Origination Clause less bite than it otherwise might have had. But the Clause nonetheless has been important historically and remains vital in the modern legislative process. By newly exempting a substantial swath of tax legislation from the Origination Clause, the panel opinion degrades the House's origination authority in a way contrary to the Constitution's text and history, and contrary to congressional practice. As a result, the panel opinion upsets the longstanding balance of power between the House and the Senate regarding the initiation of tax legislation. Therefore, I would grant rehearing en banc. In my respectful view, the en banc Court should vacate the panel opinion and rule for the Government on the ground that the Affordable Care Act originated in the House and thereby complied with the Origination Clause.

At oral argument in the Supreme Court's most recent Origination Clause case some years ago, *United States v. Munoz-Flores*, 495 U.S. 385 (1990), Justice O'Connor posed

a hypothetical about a national highway funding bill that increased income taxes to be paid into the general treasury "for that purpose" – that is, to "support the road building." That hypothetical almost precisely tracks the Origination Clause issue we face in this case. The hypothetical was not presented in *Munoz-Flores*, but Justice O'Connor asked about it to test the limits of the Government's theory. The Government attorney dutifully claimed (then as now) that such a hypothetical bill would not be subject to the Origination Clause. Justice O'Connor responded: "Well, that's a pretty extreme position." True then. And true now.

I

On October 8, 2009, the House of Representatives passed H.R. 3590, the Service Members Home Ownership Tax Act of 2009. That bill, among other things, modified the first-time homebuyer tax credit for service members, increased some corporate tax prepayment rates, and increased the tax penalty for failing to file certain corporate tax returns. After passing in the House, H.R. 3590 was sent to the Senate. There, Senate Majority Leader Harry Reid offered an "Amendment in the nature of a substitute" to H.R. 3590. The amendment struck all of the language after the bill's introductory "enacting clause" and inserted in its place the Senate's version of what became the Affordable Care Act. Instead of introducing a new Senate bill, Senator Reid proceeded via amendment of a House bill. By proceeding in that manner, the Senate recognized that the Origination Clause of the Constitution requires revenue-raising bills to originate in the House. The Senate passed the amended bill on December 24, 2009, and the House in turn passed the amended bill without further change on March 21, 2010. President Obama then signed it into law on March 23, 2010.

4

Sissel argues that the Affordable Care Act is a bill "for raising Revenue" that had to originate in the House under the Origination Clause of the Constitution. He further contends that the law did not originate in the House. Sissel is correct about the first point but wrong about the second. The Affordable Care Act was a bill for raising revenue. But it originated in the House.

The Origination Clause appears in Article I, Section 7, Clause 1 of the Constitution. It provides: "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." Although obscure to many observers today, the Clause was very important to the Framers and remains vital to the modern legislative process. The Origination Clause was one of the many finely tuned mechanisms the Framers adopted to separate power within the new national government, so as to avoid the dangers of concentrated power and thereby protect individual liberty.

To explain the background: At the Constitutional Convention, the structure and powers of the national government were the subject of contentious deliberations. Those deliberations included great debates about the Legislative Branch. Many feared that a single legislative body would become too powerful, swallow up the other Branches, and threaten individual liberty. *See generally* THE FEDERALIST NO. 48, at 309 (James Madison) (Clinton Rossiter ed., 1961). In addition, the smaller states worried that representation by population in the national legislature would overwhelm their interests, while the larger states feared that equal representation for each state would unfairly dilute the larger states' power and make them easy financial targets. *See* 1 *The Records of the Federal Convention of 1787*, at 177-80 (Max Farrand ed., 1911). To help address some of those

concerns, the Framers reached a Great Compromise. The Convention established a bicameral legislature that would divide the legislative power between two bodies, thereby preventing concentration of power in a single legislative assembly. To resolve the large state versus small state dispute, the Great Compromise provided for equal representation by state in the Senate and proportional representation by population in the House.

With two bodies, however, also came the delicate task of allocating legislative powers between the House and Senate. The taxing power was perhaps the most critical. After all, one great failing of the Articles of Confederation was the inability of the national government to tax citizens and fund national priorities such as the military. The delegates at Philadelphia therefore granted Congress a broad power to tax. At the same time, the Framers understood the dangers inherent in the power to tax, namely, that "the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819). They had just fought a war for independence fueled by outrage at taxation without representation.

So the delegates vigorously debated how to divide the power to tax between the House and the Senate. The Convention ultimately decided to grant the House of Representatives the exclusive power to originate tax bills, although the bills would then be open to Senate amendment. As James Madison later explained, the "principal reason" why the Constitution gave exclusive origination power to the House was that members of the House are "chosen by the People," "best acquainted with their interests," and subject to "more frequent[]" elections. 1 *Debates and Proceedings in the Congress of the United States* 361 (Joseph Gales ed., 1834).

The Origination Clause was so central to the founding blueprint that one delegate to the Constitutional Convention, reflecting the prevailing sentiment, warned that the "acceptance of the [Constitutional] plan will inevitably fail, if the Senate be not restrained from originating Money bills." 2 *The Records of the Federal Convention of 1787*, at 275 (statement of Elbridge Gerry) (Aug. 13, 1787) (Max Farrand ed., 1911); *id.* at 5 (statement of Elbridge Gerry) (July 14, 1787) (calling the Origination Clause the "corner stone" of the Great Compromise). Likewise, during the crucial ratification debates in New York, Madison stressed the importance of the House's origination authority. *See* THE FEDERALIST NO. 58 (James Madison).

The House's origination power, like other aspects of the constitutionally established separation of powers, was "not simply an abstract generalization in the minds of the Framers," but was expressly "woven into the document that they drafted in Philadelphia in the summer of 1787." *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919, 946 (1983) (quoting *Buckley v. Valeo*, 424 U.S. 1, 124 (1976)) (internal quotation marks omitted).

Those structural details, the Supreme Court has stated many times, are not simply matters of etiquette or architecture. They also help protect individual liberty – in this instance, by ensuring that only those representatives closest to the people can initiate legislation to wrest money from the people. *See generally Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 501 (2010) (the "Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty") (internal quotation marks omitted); *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) ("Liberty is always at stake when

one or more of the branches seek to transgress the separation of powers."); *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991) ("The ultimate purpose of this separation of powers is to protect the liberty and security of the governed."); *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 537 F.3d 667, 714 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("the separation of powers protects not simply the office and the officeholders, but also individual rights").

Moreover, what "the Court has said of the allocation of powers *among* branches is no less true of such allocations *within* the Legislative Branch." *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). "Provisions for the separation of powers within the Legislative Branch are thus *not* different in kind from provisions concerning relations between the branches; both sets of provisions safeguard liberty." *Id.* at 395.

Because the constitutional structure helps safeguard individual liberty, the Judiciary has long played a critical role in preserving the structural compromises and choices embedded in the constitutional text. The Supreme Court has often explained that, in cases where a plaintiff has standing, the "courts possess power to review either legislative or executive action that transgresses identifiable textual limits." *Nixon v. United States*, 506 U.S. 224, 238 (1993); *Powell v. McCormack*, 395 U.S. 486, 506 (1969); *Marbury v. Madison*, 5 U.S. 137, 176 (1803) ("The powers of the legislature are defined, and limited," and "those limits may not be mistaken, or forgotten."). Consistent with those general principles, the Supreme Court has held that the Judiciary possesses the authority and the responsibility to address and remedy violations of the Origination Clause. *See Munoz-Flores*, 495

U.S. at 387. As the Court stated in *Munoz-Flores*: "Surely a judicial system capable of determining when punishment is 'cruel and unusual,' when bail is '[e]xcessive,' when searches are 'unreasonable,' and when congressional action is 'necessary and proper' for executing an enumerated power is capable of making the more prosaic judgments demanded by adjudication of Origination Clause challenges." *Id.* at 396.[1]

It is therefore our duty here to assess whether the Affordable Care Act complied with the Origination Clause.

## II

The Affordable Care Act is, among other things, a massive tax bill. The Congressional Budget Office forecasted that the Act would raise $473 billion in revenue over 10 years. *See* Letter from Douglas W. Elmendorf, Director, Congressional Budget Office, to Nancy Pelosi, Speaker of the United States House of Representatives (March 20, 2010), in Congressional Budget Office, Selected CBO Publications Related to Health Care Legislation, 2009-2010, at 21-22 (2010).[2] Those new revenues were indispensable to the law

---

[1] To be sure, a potentially challenging remedial or severability question arises if a law is found to violate the Origination Clause: Should a court invalidate the whole law or strike only those revenue-raising provisions that originated in the Senate? We need not address that question in this case because the Act did originate in the House, as explained below.

[2] That revenue number represents the CBO's revenue projection for only the Affordable Care Act, H.R. 3590, not for that Act in combination with the Health Care and Education Reconciliation Act of 2010, H.R. 4872. The Reconciliation Act was passed shortly after the Affordable Care Act and made certain corrections to it. Considered together, the two bills were projected

because proponents did not want the law's new health insurance subsidies and expanded Medicaid entitlements to substantially increase the annual budget deficit and add to the Nation's overall debt. The new revenues would largely offset the Act's significant new expenditures on the overall federal balance sheet, or at least that was the hope. The revenue provisions were essential to counter fears and accusations that the new law would bust the budget. *See generally* Steven Brill, *America's Bitter Pill* 164 (2015) ("The main concern at the White House was revenue.").

The Act contains a wide variety of revenue-raising provisions ranging from the tax penalty on individuals who do not have insurance (commonly known as the individual mandate), to the tax penalty on employers who do not provide insurance, to additional payroll taxes, to new taxes on "Cadillac" health plans, pharmaceutical manufacturers, medical device companies, health insurers, and cosmetic surgery. *See* Pub. L. No. 111-148, §§ 1501, 1513, 9015, 9001, 9008, 9009, 9010, 9017, 124 Stat. 119 (2010). The Act refers to the Internal Revenue Code about 200 times. It also uses the word "tax" about 200 times. It dedicates an entire title to "Revenue Provisions." *See id.* tit. IX. And the Congressional Budget Office repeatedly scored the Act's effects on revenue enhancement and deficit reduction. *See* Selected CBO Publications Related to Health Care Legislation, 2009-2010.

There may be close calls in determining whether a bill raises revenue for purposes of the Origination Clause. In my view, this case is not a close call. Under the text, history, and

---

to raise $525 billion in revenue over 10 years. *See* Selected CBO Publications Related to Health Care Legislation, 2009-2010, at 21.

precedent of the Origination Clause, a bill such as the Affordable Care Act that raises substantial revenue that is used for general governmental purposes easily qualifies as a bill "for raising Revenue." As the Supreme Court has explained, the Origination Clause applies to a "statute that raises revenue to support Government generally." *United States v. Munoz-Flores*, 495 U.S. 385, 398 (1990). That description readily covers the Affordable Care Act.

The Government nevertheless argues (and the panel opinion surprisingly agreed) that the Affordable Care Act is not a revenue-raising bill subject to the Origination Clause. I respectfully but strongly disagree.

To begin with, the Government points out that the Affordable Care Act has purposes other than raising revenue. That is of course true. That is true of most legislation. But that is also irrelevant under the Origination Clause. No case or precedent of which I am aware has said that a law that raises revenues for general governmental use is exempt from the Origination Clause merely because the law has other, weightier non-revenue purposes. Imagine a simple gas tax bill introduced in the Senate. Suppose that the bill is combined with a major national security bill also introduced in the Senate. Does that render the combined Senate bill exempt from the Origination Clause because the national security purposes predominate? Of course not. If it were otherwise, the Senate could systematically evade the Origination Clause by tacking Senate-originated revenue provisions onto other Senate-originated bills. But that is neither the law nor the congressional practice.

Likewise, no case or precedent of which I am aware has said that a regulatory tax – that is, a tax that seeks in some way to influence conduct – is exempt from the Origination

Clause merely because such a tax also has a purpose of encouraging or discouraging certain behavior. It does not matter whether that regulatory purpose might be said to predominate. Imagine the same gas tax bill introduced in the Senate. Suppose that its sponsors say that the bill is designed to discourage excessive driving, encourage the use of public transportation, and help the environment. Does that render it exempt from the Origination Clause? Of course not. Otherwise, most taxes would escape the Origination Clause. After all, virtually every tax has the dual purposes of raising revenue and influencing behavior. To borrow the words of the Supreme Court: "[E]very tax is in some measure regulatory." *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2596, slip op. at 37 (2012) (quoting *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937)) (internal quotation marks omitted); *see also id.* at 2596, slip op. at 36 ("taxes that seek to influence conduct are nothing new"). That is because a tax "interposes an economic impediment to the activity taxed as compared with others not taxed." *Id.* at 2596, slip op. at 37 (internal quotation marks omitted). It is neither the law nor the practice to exempt regulatory taxes from the Origination Clause.

And consider this. Suppose the Affordable Care Act had been split into two bills. One bill had all the subsidies, entitlements, and new regulatory prohibitions. The other bill had all the new taxes and revenue-raising provisions. Even the Government and the panel opinion would presumably concede that the Origination Clause applies to the latter bill. But when the two bills are combined into one bill, the requirements of the Origination Clause magically disappear, they say. That makes little sense, at least to me.

As a practical matter, moreover, while courts can sometimes identify the various purposes of a law, it is

extremely difficult for a Court to identify *one* predominant purpose. Courts cannot realistically determine the predominant purpose of a regulatory tax, or of a large piece of legislation with numerous provisions and multiple objectives. Indeed, the Supreme Court has cautioned against trying to divine a legislature's "primary" purpose. The "search for legislative purpose is often elusive enough, without a requirement that primacy be ascertained." *McGinnis v. Royster*, 410 U.S. 263, 276 (1973) (citation omitted). Complicating the task still further, each legislator could have a different "primary" purpose for passing a revenue bill. And judicial inquiries into those purposes "would allow courts to peruse legislative proceedings for subtle emphases supporting subjective impressions and preferences." *Id.* at 277; *see also* Max Radin, *Statutory Interpretation*, 43 Harv. L. Rev. 863, 870 (1930) ("The chances that of several hundred men each will have exactly the same determinate situations in mind . . . are infinitesimally small."); *cf. In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759 (D.C. Cir. 2014) ("[T]rying to find *the* one primary purpose for a communication motivated by two sometimes overlapping purposes . . . can be an inherently impossible task.").

The panel concurrence in the denial of rehearing en banc confidently says: "The purpose of the ACA was to overhaul the national healthcare system, not to raise revenue." Panel Concurrence at 9. But the purpose of the Act was to overhaul the national healthcare system *and* to raise revenue. You couldn't do the former without also doing the latter.

But put aside the basic theoretical and practical problems with the Government's argument. The Government's theory suffers from more fundamental flaws, namely that it contradicts the Origination Clause's text, history, and precedent.

Consider the text. The text of the Origination Clause unmistakably embraces all bills that are intended to raise revenue. The Clause says that it applies to "All Bills for raising Revenue." Period. The text of the Clause does not exempt bills that also accomplish other objectives or serve other predominant purposes. As long as the bill raises revenue, the text of the Clause requires that the bill originate in the House.

Importantly, moreover, that text reflects a deliberate choice made by the Framers at Philadelphia. During the Constitutional Convention, Virginia delegate Edmund Randolph proposed that the protections of the Origination Clause apply only to bills that were *solely* for raising revenue. He suggested in particular that the Clause apply only to "Bills for raising money for the *purpose of revenue*." 2 *The Records of the Federal Convention of 1787*, at 273 (Aug. 13, 1787) (Max Farrand ed., 1911).

James Madison objected to Randolph's formulation. "In many acts," Madison presciently said, "the object would be twofold." *Id.* at 276 (statement of James Madison) (Aug. 13, 1787). Although the "raising of revenue would be one of them," how "could it be determined which was the primary or predominant one"? *Id.* (Aug. 13, 1787). Madison might as well have been speaking about the Affordable Care Act.[3]

---

[3] Madison was not a supporter of the Origination Clause, as the panel concurrence notes. But that is in part because he wanted proportional representation in the Senate. The Great Compromise eliminated proportional representation in the Senate, with the Origination Clause being some recompense to the large States for agreeing to the Compromise. Madison saw the Origination Clause as weak compensation for losing proportional representation in the

14

In his statement opposing Randolph's approach, Madison cited historical experience. He noted that when tensions "first opened" with Great Britain, "their power to regulate trade was admitted. Their power to raise revenue rejected." *Id.* (Aug. 13, 1787). Yet it proved impossible to distinguish between the two powers because trade regulations raised revenue in addition to serving other purposes. As Madison summarized: "An accurate investigation of the subject afterward proved that no line could be drawn between the two cases." *Id.* (Aug. 13, 1787).

Madison's view about Randolph's "for the purpose of revenue" language prevailed, and the Convention defeated Randolph's proposal by a vote of 7 to 4. *See id.* at 280 (Aug. 13, 1787).[4] Over the ensuing weeks, the delegates engaged in further back and forth about the Clause, but the "for the purpose of revenue" language never made it into the final version of the Clause.

The panel concurrence says that the Convention's formal rejection of the words "for the purpose of revenue" was

---

Senate. Madison also pointed out several flaws in various proposed versions of the Clause, including the problem of trying to identify a primary purpose of legislation. The Convention agreed with him on that point. Contrary to the suggestion in the panel concurrence, Madison's prescient and successful objection to the "purpose of revenue" language cannot be deemed irrelevant simply because he also had other concerns about the Clause.

[4] The panel concurrence says that delegates to the Convention "expressed no opposition" to the "narrowing" proposed by Randolph. Panel Concurrence at 19. That is incorrect. Madison's statement objected to the precise words that the concurrence now contends were incorporated *sub silentio* into the final version of the Clause. And the vote was 7 to 4 in Madison's favor.

largely meaningless, a mere stylistic change. In the panel concurrence's view, the final version of the Clause still applies only to bills for raising revenue "for the purpose of revenue," even though the Convention deleted the words "for the purpose of revenue." *See* Panel Concurrence at 19-20, 24-25. James Madison thought otherwise. He believed that deletion of that language mattered substantively. I will go with James Madison on this one.

Consistent with the text and drafting history of the Origination Clause, the House of Representatives has long asserted its Origination Clause prerogative. The House does so by a practice known as "blue-slipping" a Senate bill. Most importantly for this case, the House has regularly asserted its Origination Clause authority against Senate-originated bills that have the "twofold" revenue-raising and regulatory purposes identified by Madison. For example, asserting the Origination Clause, the House has frequently declined to consider Senate-originated bills that would impose regulatory taxes and deter or encourage certain activities. *See* 3 Lewis Deschler, *Deschler's Precedents of the United States House of Representatives* ch. 13, § 15.5 (1977) (bill using tax penalties to deter overfishing); *id.* § 15.3 (bill using tax exemptions to support the Olympic Games); *id.* § 15.7 (bill amending the National Firearms Act); *see also* H.R. 249, 106th Cong. (1999) (bill that relates to a gun tax).

That history of Congressional practice is relevant here because, as the Supreme Court has explained, "[l]ong settled and established practice is a consideration of great weight" in separation of powers cases. *National Labor Relations Board v. Noel Canning*, 134 S. Ct. 2550, 2559, slip op. at 7 (2014) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)) (alteration in original).

It is true that the House may go beyond the Origination Clause and, as a matter of its own internal rules, require even non-revenue bills to originate in the House. But that's not what was happening in those historical examples. In those historical examples (and many others), the House *expressly* cited and relied on its longstanding interpretation of the Origination Clause. Under Supreme Court precedent, Congress's longstanding constitutional interpretation and practice does not bind us, but it informs our interpretation. *See Zivotofsky v. Kerry*, No. 13-628, slip op. at 20-21 (U.S. June 8, 2015); *Noel Canning*, 134 S. Ct. at 2559, slip op at 7.

All of the above seems rather straightforward and a matter of common sense in demonstrating that the Origination Clause applies to revenue-raising bills such as the Affordable Care Act. Indeed, back in 2009, the Senate itself understood that the Act was a revenue-raising bill and that the Origination Clause therefore applied to the Act. That is one reason why Majority Leader Reid introduced the Affordable Care Act as an amendment to a House revenue bill rather than as a stand-alone Senate bill.

So how do the Government and the panel opinion reach the contrary conclusion? The answer, in my respectful view, is that they incorrectly read the Supreme Court precedents on the Origination Clause. Those cases have carved out a narrow exception to the Origination Clause for certain relatively unusual statutory schemes. The panel opinion blows that narrow exception up into a giant new exemption from the Origination Clause, even for obviously revenue-raising bills such as the Affordable Care Act, which raises $473 billion in revenue.

The Supreme Court has stated that "revenue bills are those that levy taxes in the strict sense of the word." *Twin*

*City Bank v. Nebeker*, 167 U.S. 196, 202 (1897); *Munoz-Flores*, 495 U.S. at 397. The Affordable Care Act levies numerous such taxes. To be sure, the Supreme Court has stated that "bills for other purposes which may incidentally create revenue" are not "Bills for raising Revenue" within the meaning of the Clause. *Id.* But those cases did not exempt from the Origination Clause all laws that have additional or predominant purposes other than raising revenue. Those cases did not exempt regulatory taxes from the Origination Clause. The Supreme Court has been very careful to exclude from the Origination Clause only those bills that have "*no* purpose by the act or by any of its provisions to raise revenue to be applied *in meeting the expenses or obligations of the Government.*" *Nebeker*, 167 U.S. at 203 (emphasis added) (tax on banks used to pay for the printing of currency has "no purpose" to raise general revenue); *see also Millard v. Roberts*, 202 U.S. 429, 436-37 (1906) (property tax used to construct railroad infrastructure has "no purpose" to raise general revenue) (internal quotation marks omitted); *Munoz-Flores*, 495 U.S. at 398-99 (special assessment on convicted criminals to fund the Crime Victims Fund has "no purpose" to raise general revenue) (internal quotation marks omitted).

What has the Supreme Court meant in carving out this exception or limitation? As the Court's cases reveal, the critical distinction drawn by the Supreme Court in its Origination Clause cases is between (i) laws that raise revenues paid into the general treasury and available for general governmental uses and (ii) laws that raise revenues designated for use in a specific program. Laws in the former category – which encompasses the vast majority of laws that raise money – are subject to the Origination Clause. Laws in the latter category are not subject to the Origination Clause.

Indeed, the Supreme Court said this explicitly in *Munoz-Flores*, its most recent Origination Clause case. The Court quoted the "bills for other purposes which may incidentally create revenue" language from *Nebeker*. Then the *Munoz-Flores* Court immediately stated: "The Court has interpreted this general rule to mean that a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support Government generally, is not a 'Bil[l] for raising Revenue' within the meaning of the Origination Clause." *Munoz-Flores*, 495 U.S. at 397-98. *Munoz-Flores* thus tells us exactly how to interpret the *Nebeker* "other purposes" language and what it means. *Id.* *Munoz-Flores* unambiguously understood *Nebeker*'s exception for "bills for other purposes which may incidentally create revenue" to apply to a carefully circumscribed set of cases.

A review of the Court's older Origination Clause cases further illustrates the point. In *Nebeker*, for example, the law imposed a tax on banks. But the tax was not imposed to raise revenue for general governmental purposes; rather, the law imposed the tax "to meet the expenses attending the execution of the act" – that is, to fund the printing and distribution of America's first treasury-backed currency. *Nebeker*, 167 U.S. at 202. The Supreme Court concluded that the law therefore fell outside the scope of the Origination Clause. The statute, the Court explained, had "no purpose" to raise funds "to be applied in meeting the expenses or obligations of the Government." *Nebeker*, 167 U.S. at 203. Rather, all of the funds raised were designated by law to be used to pay the costs of printing and distributing currency.

In *Millard*, the Court considered a tax on property in the District of Columbia. The tax was designated by law solely to fund railroad infrastructure improvements in the District of

Columbia.  The Court held that the law imposing the tax was not subject to the Origination Clause.  The Court found that the arrangement was "'practically that of a contract'" between the Government and the railroad companies, in which the revenues were "but means to the purposes provided by the act."  *Millard*, 202 U.S. at 437.

Finally, in *Munoz-Flores*, the Court relied on *Nebeker* and *Millard* and again reached a similar conclusion.  The Court concluded that a bill that fined convicted criminals and redistributed those funds to a Crime Victims Fund had "no purpose" to raise general revenues to be used for general governmental purposes.  *Munoz-Flores*, 495 U.S. at 398 (internal quotation marks omitted).

For the Court in *Munoz-Flores*, the essential point, as "in *Nebeker* and *Millard*," was that the provision at issue raised money only "as part of a *particular* program to provide money *for* that program."  *Id.* at 399 (emphases added).  To reiterate, the *Munoz-Flores* Court summarized the critical Origination Clause principle as follows:  A "statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support Government generally, is not a 'Bil[l] for raising Revenue' within the meaning of the Origination Clause."  *Id.* at 398.  In other words, under *Munoz-Flores*, the Origination Clause *does* apply to "a statute that raises revenue to support Government generally."  *Id*.

The *Nebeker-Millard-Munoz-Flores* principle applies only if the law in question designates that the revenues be used for a specific program.  Importantly, the fact that a law raises revenue to be paid into the treasury to help generally offset the costs of a new program on the overall federal balance sheet has never been held to exempt the law from the

Origination Clause. Otherwise, to take one example, a massive income tax increase imposed for the avowed purpose of offsetting the costs of new wartime efforts against al Qaeda and ISIS would be exempt from the Origination Clause. Under the panel opinion, such a tax law would not be subject to the Origination Clause. What the panel opinion misses is that many laws that create government programs also raise revenues, especially given strict congressional "paygo" rules. But those laws remain subject to the Origination Clause. As noted above, that was the precise hypothetical Justice O'Connor raised in *Munoz-Flores*. She accurately called the Government's contention that the Origination Clause would not apply in such a situation "pretty extreme."

One scholar has summarized the Court's case law this way: If "a statute funds the general treasury instead of a specific program or service, it has a primary purpose of raising revenue. Alternatively, if the statute funds a specific activity or segment, it falls outside the scope of the Clause." Rebecca M. Kysar, *The 'Shell Bill' Game: Avoidance and the Origination Clause*, 91 Wash. U. L. Rev. 659, 674 (2014). The Origination Clause case law, therefore, "fails to support judicial inquiry into Congress's purpose in enacting a statute. Rather, the Court takes as a proxy that such purpose is non-revenue-raising when the structure of the statute earmarks revenues to fund a program it creates." *Id.* at 676.

That said, *Munoz-Flores* had one wrinkle that is important to understand. The statutory scheme in *Munoz-Flores* provided that any contributions to the Crime Victims Fund in excess of $100 million a year would be transferred to the general treasury (and thus available for general governmental purposes), rather than redistributed to crime victims. The Court responded in two ways. The Court first swept that scenario aside as one that would rarely occur in

practice. *See Munoz-Flores*, 495 U.S. at 398-99. And the Court said that, in any event, any such leftover amount would not be "substantial" and thus was not an Origination Clause concern:

> As in *Nebeker* and *Millard*, then, the special assessment provision was passed as part of a particular program to provide money for that program – the Crime Victims Fund. Although any excess was to go to the Treasury, there is no evidence that Congress contemplated the possibility of a substantial excess, nor did such an excess in fact materialize. Any revenue for the general Treasury that § 3013 creates is thus "incidenta[l]" to that provision's primary purpose.

*Id.* at 399. *Munoz-Flores* therefore reinforced that the Origination Clause does apply to a bill that raises "substantial" revenue to be "paid into the General Treasury." *Id.*

The narrow exception identified in *Nebeker*, *Millard*, and *Munoz-Flores* does not encompass the Affordable Care Act. The Affordable Care Act imposes a vast array of taxes and raises significant amounts of revenue that are paid into the general treasury and available for general governmental uses. The amount of revenue the Act raises is enormous – $473 billion over 10 years. The Affordable Care Act does not designate its tax revenues to be used only in particular programs. Under the relevant Supreme Court precedent, therefore, as well as the text and history of the Clause, the Affordable Care Act is a revenue-raising bill subject to the Origination Clause.

To be sure, some might say that the *Nebeker-Millard-Munoz-Flores* line of cases is itself inconsistent with the

constitutional text because the laws in those cases did raise money, even though the money was designated by law for specific programs. The explanation for those cases seems straightforward: Here, as in other areas of constitutional law, the Supreme Court over time has carved out a narrow exception to (or limitation on) the general constitutional rule. The Court often does that in constitutional adjudication, sometimes when there is a compelling governmental interest in doing so, sometimes when history supports doing so, and sometimes when the exception is minimal, to take three common examples. *See, e.g.*, *Williams-Yulee v. Florida Bar*, No. 13-1499 (U.S. Apr. 29, 2015).

The fundamental flaw in the panel opinion is that it transforms that heretofore narrow and rare exception to the Origination Clause into a broad new exemption. The broad new exemption created by the panel opinion presumably covers bills imposing regulatory taxes and many other bills that raise significant revenue – commonplace bills that all of the relevant players have previously understood to be subject to the Origination Clause. After all, if the panel opinion's new exemption applies to a law that raises *$473 billion in revenue*, it surely will cover lots of other bills that previously would have been thought to come within the Origination Clause.

Put simply, using the narrow *Munoz-Flores* exception to exempt the $473 billion Affordable Care Act from the Origination Clause is a textbook example of missing the forest for the trees.

To sum up so far: The Government and the panel opinion have gone astray in concluding that the Affordable Care Act is not a revenue-raising bill under the Origination Clause. The panel opinion is wrong on that point, and wrong in a way

that, if followed, would degrade the House of Representative's constitutional prerogative to originate revenue-raising bills. Sissel's en banc petition says it well: "The panel's 'purposive approach' all but guts the Origination Clause by effectively enabling the Senate to originate tax bills that might have some broader social purpose." Petition for Rehearing En Banc at 2. In light of the importance of this issue to our constitutional structure and to the individual liberty protected by that structure, I would grant rehearing en banc to vacate the panel opinion's flawed and consequential Origination Clause holding.[5]

## III

Although the Affordable Care Act is a law for raising revenue and therefore was subject to the Origination Clause, the Act did in fact originate in the House, as required by that Clause. For that reason, I would reject Sissel's Origination Clause claim.

To recap: On October 8, 2009, the House passed H.R. 3590, originally called the Service Members Home Ownership Tax Act of 2009. The Senate then amended that

---

[5] As explained above, the Origination Clause inquiry focuses on the entire law. If any provision of the law raises revenue for general governmental purposes, then the Origination Clause applies. But even if the relevant Origination Clause inquiry focused only on a particular provision of the law, rather than on the law as a whole, the tax on individuals who do not have insurance (known as the individual mandate) alone was forecast to raise massive amounts of revenue, approximately $4 billion a year by 2017. *National Federation of Independent Business*, 132 S. Ct. at 2594, slip op. at 33. Therefore, the individual mandate itself is a revenue-raising provision.

bill, substituting the text of what became the Affordable Care Act for the text that had been passed in the House.

Sissel contends that the Senate's amendment substituting the Affordable Care Act for the text of the Service Members Home Ownership Tax Act "was not a lawful 'amendment' of H.R. 3590 as required by the Origination Clause" because it was not "'germane to the subject matter of the [House] bill.'" Appellant's Br. 21 (quoting *Flint v. Stone Tracy Co.*, 220 U.S. 107, 143 (1911)).

Sissel's claim is unavailing. The Origination Clause imposes no germaneness requirement on the Senate when it amends revenue-raising bills that originated in the House. That is apparent from the text, history, and precedent of the Origination Clause.[6]

---

[6] H.R. 3590 modified the first-time homebuyer tax credit for service members, increased the pre-payment amount for corporate taxes, and increased the tax penalty for failing to file certain corporate tax returns. H.R. 3590 (as passed by the House on October 8, 2009). The Joint Committee on Taxation estimated that several provisions of H.R. 3590 would raise significant revenue. *See* Joint Committee on Taxation, Estimated Revenue Effects of H.R. 3590, the "Service Members Home Ownership Tax Act of 2009" (Oct. 6, 2009). As noted above, *see* pages 19-20, if a bill raises revenue, the Origination Clause applies, even if the overall bill is deficit neutral. So it was in the original H.R. 3590. But what happens when the original House-passed bill does not contain any revenue-raising provisions at all? Can the Senate amend such a bill to add revenue-raising provisions? Under the prevailing view, the original House-passed bill must itself contain revenue-raising provisions in order for the Senate to permissibly add revenue-raising provisions through its amendment process. *See* James V. Saturno, Congressional Research Service, *The Origination Clause*

To begin with, the germaneness requirement that Sissel urges is inconsistent with the text of the Origination Clause. The Origination Clause permits the Senate to "propose or concur with Amendments *as on other Bills*." U.S. Const. art. I, § 7, cl. 1 (emphasis added). The text of the Origination Clause therefore grants the Senate as much authority to amend revenue bills as it grants the Senate to amend other bills. There is no general germaneness requirement when the Senate amends other House bills. It follows that there is no germaneness requirement when the Senate amends revenue bills. "As on other Bills" means "As on other Bills."

The language permitting Senate amendment of revenue bills was critical, moreover, to the Constitutional Convention. In early English practice, revenue bills had to originate in the House of Commons, and the House of Lords could not amend those revenue bills. By contrast, after Independence in 1776, several of the new American States departed from English practice by allowing the upper houses of their states' legislatures to amend revenue bills. The Constitutional Convention followed the latter model and allowed Senate amendments to House-originated revenue bills. *See* 1 David K. Watson, *The Constitution of the United States: Its History Application and Construction* 342-43 (1910); S. Rep. No. 42-146, at 3 (1872) (contrasting the "strict[]" amendment

---

*of the U.S. Constitution: Interpretation and Enforcement*, at 6 (March 15, 2011). But this case does not require a definitive judicial answer to that question because the original House bill here in fact contained revenue-raising provisions. One related note: In practice, Congress seems to broadly apply the Origination Clause to all revenue-*affecting* bills because of the potential difficulty of determining whether a tax bill raises or reduces revenues. *Id.* at 4. But the House bill here was clearly revenue-*raising*, so we need not explore that issue further.

limitations on the House of Lords with the expansive amendment power "our fathers provided" to the Senate).

The language permitting broad Senate amendments was not an accident but instead was a deliberate and considered decision at Philadelphia. The delegates initially considered language that would not have allowed Senate amendment of revenue bills. 1 *The Records of the Federal Convention of 1787*, at 524-25 (July 5, 1787) (Max Farrand ed., 1911). But after debate, the delegates provided for a broad Senate amendment power. One delegate, Elbridge Gerry, later lamented that the broad Senate amendment power weakened the force of the Clause. 3 *id.* at 265. During the Virginia ratification debates, William Grayson similarly complained that the Senate's amendment power constituted a de facto power to originate revenue bills because it would allow the Senate to delete all the language of a House bill and substitute entirely new language. 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 377 (Jonathan Elliot ed., 1881). No doubt Gerry and Grayson were right to perceive that the Senate's broad amendment power would weaken the force of the Clause. But courts must respect the Constitution's text. And the relevant text gives the Senate a broad amendment power.

Consistent with the Constitution's text, moreover, Congress's longstanding practice has been to permit Senate amendments of exactly the kind at issue here, in which the Senate essentially guts the House bill and replaces the House language with Senate language. *See* Thomas Jefferson, *A Manual of Parliamentary Practice, For the Use of the Senate of the United States* § 35, at 107 (Davis & Force 1820) (1801) ("Amendments may be made so as totally to alter the nature of the proposition," and entirely new propositions can be "ingrafted by way of amendment on the words 'Be it

enacted.'"); S. Rep. No. 42-146, at 3 (When "a bill for raising revenue has originated in the House, no limitation is placed by the Constitution upon the power of the Senate to amend it . . . . The exclusive prerogative of the House of Representatives in relation to such bills is simply to *originate* them.").

That historical practice has continued to the present day. There are many modern examples of so-called "gut and replace" legislation. *See, e.g.*, American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, 126 Stat. 2313 (2013); Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (2008); Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 (1986).

That historical practice matters. *See National Labor Relations Board v. Noel Canning*, 134 S. Ct. 2550, 2559, slip op. at 7 (2014) (historical practice "'is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning'") (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)).

Most importantly for us as a lower court, the relevant Supreme Court case law forecloses the germaneness requirement advanced by Sissel. In *Rainey v. United States*, 232 U.S. 310 (1914), the Supreme Court concluded that there was no germaneness requirement on Senate amendments to revenue bills. In that case, the Senate had amended a House-originated tariff bill to include a new tax on foreign-made yachts. *Id.* at 315-17. The Court stated: "Having become an enrolled and duly authenticated Act of Congress, it is not for

this Court to determine whether the amendment was or was not outside the purposes of the original bill." *Id.* at 317.[7]

*Rainey* is squarely on point and has never been overruled. That decision resolves the germaneness issue in this case in favor of the Government.

To overcome *Rainey*, Sissel cites a pre-*Rainey* case, *Flint v. Stone Tracy Co.*, 220 U.S. 107, 143 (1911). In upholding the law there against an Origination Clause challenge, *Flint* noted that the amendment enacted in the Senate "was germane to the subject-matter of the bill and not beyond the power of the Senate to propose." *Id.* But the *Flint* Court did not draw any legal conclusions from that description of the bill. Therefore, *Flint* may not properly be read to impose a judicially enforceable germaneness requirement, especially in light of *Rainey*'s later rejection of just such a requirement.

In short, notwithstanding the Senate's amendment, the Affordable Care Act originated in the House.

IV

Before closing, a few final comments:

Some understandably say that allowing the Senate to exercise such a broad amendment power over revenue-raising

---

[7] If Senate rules imposed a germaneness requirement for all amendments to legislation, would such a germaneness requirement then be enforceable under the Origination Clause, notwithstanding *Rainey*, given that the Clause says that the Senate may amend revenue bills "as on other Bills"? We need not confront that question here because there is no such Senate rule imposing a general germaneness requirement for amendments.

bills greatly diminishes the force of the Clause and makes the Origination Clause unimportant. There are two responses to that observation. First, as judges, we have no choice but to respect the text, history, and precedent of the Clause, which plainly grant the Senate a broad amendment power. Courts do not have authority to redesign the constitutional structure as we might like it. To make such structural changes, there is a constitutional amendment process – one that has been utilized to make major changes to the original design. *Cf.* U.S. Const. amends. 12, 14, 17, 20, 22, 25; *see generally Arizona State Legislature v. Arizona Independent Redistricting Commission*, No. 13-1314 (U.S. June 29, 2015) (Roberts, C.J., dissenting); Akhil Reed Amar, *America's Constitution: A Biography* 285-99, 313-463 (2005). Second, although the Senate's amendment power no doubt significantly weakens the potential force of the House's origination power, the House's first-mover authority still gives it substantial control over tax legislation, as Madison explained and as history has borne out. In the real world, the House's exclusive origination power matters. *See generally* Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. Chi. L. Rev. 361, 424-25 (2004). To say that the House's origination power is less than it could have been is not to say that the House's origination power is meaningless.

Some might respond, however, that even accepting the general importance of the Origination Clause, the panel opinion is no big deal because the House of Representatives has the power to protect itself from the consequences. It is true that the House may go beyond the text of the Origination Clause and, as a matter of its own rulemaking powers, require even non-revenue bills to originate in the House – or else not pass the bills. Article I, Section 5, Clause 2 of the Constitution guarantees that "Each House may determine the

Rules of its Proceedings." The House and Senate of course may not disregard the Origination Clause or subtract from its requirements. But as part of their own rules or practices, they may insist on further requirements beyond what the Origination Clause demands.

But there are at least three problems with relying on the House's self-help power as a basis for downplaying the consequences of the panel opinion.

First, that suggestion is almost akin to saying that the Origination Clause is a political question that Congress can sort out without judicial intrusion. But the Supreme Court concluded otherwise in *Munoz-Flores*. *See United States v. Munoz-Flores*, 495 U.S. 385, 396 (1990). There, as the Court noted, the Government argued "that the House has the power to protect its institutional interests by refusing to pass a bill if it believes that the Origination Clause has been violated." *Id.* at 392. The Court rejected the Government's political question argument. The Court explained that judicial policing of the Origination Clause furthers individual liberty by safeguarding the people from excessive taxation. *See id.* at 394. In separation of powers cases, the Court does not just defer to the political branches. *See generally Zivotofsky v. Kerry*, No. 13-628 (U.S. June 8, 2015); *Marbury v. Madison*, 5 U.S. 137 (1803). It is not acceptable for courts to outsource preservation of the constitutional structure to the political branches.

Second, getting it right as a court is important because the House (now or in the future) could just roll over and acquiesce to the flawed panel opinion. But wouldn't such House acquiescence be acceptable from a separation of powers perspective? Not to the Supreme Court. The Court has made clear that even acquiescence by a political branch in

its own unconstitutionally diminished power still does not justify judicial tolerance of a separation of powers violation. Landmark cases such as *Clinton v. City of New York*, 524 U.S. 417 (1998), and *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), illustrate the point. As those cases explain, the constitutional structure is not merely a matter of etiquette but protects individual liberty. In justiciable cases, courts must enforce the Constitution's structural protections even when the affected Branch does not. *Cf. Free Enterprise Fund*, 561 U.S. at 497 ("Perhaps an individual President might find advantages in tying his own hands. But the separation of powers does not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment.") (citation and internal quotation marks omitted).

Third, judicial decisions – such as the panel opinion in this case – commonly establish a baseline that affects congressional rules, negotiations, and ultimately legislative results, as those who have labored on the Hill can readily attest. So a flawed judicial decision will often influence the give-and-take of congressional practice. To say that the House can work around the flawed panel opinion is to ignore the reality of how a flawed judicial decision can affect the negotiations by which that corrective process occurs.

\* \* \*

To read my opinion so far, you might wonder whether I think the world will end not in fire, or in ice, or in a bankruptcy court, but in an Origination Clause violation.[8] I

---

[8] *See Wellness International Network, Ltd. v. Sharif*, No. 13-935, slip op. at 17 (U.S. May 26, 2015) ("To hear the principal

of course realize there are more important constitutional issues. This case is not *Marbury v. Madison* redux. But the case is still quite important.

Although the panel opinion reached the correct bottom-line result, the panel opinion's interpretation of the Origination Clause is incorrect, in my respectful view. The panel opinion alters the longstanding balance of power between the House and Senate, and ultimately affects individual liberty. We should correct the panel opinion's error now rather than let it linger and metastasize. I would grant rehearing en banc, vacate the panel opinion, and rule for the Government on the ground that the Affordable Care Act originated in the House and thereby complied with the Origination Clause.

---

dissent tell it, the world will end not in fire, or ice, but in a bankruptcy court.").